## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michael Vernio and Kelli Gendron,                    Civil No. 19-3024 (DWF/LIB)

Plaintiffs,

v.                                                    **MEMORANDUM OPINION**
                                                      **AND ORDER**

Samuel Higgins, individually
and in his official capacity as a
Rochester Police Officer,

Defendant.

---

Joshua A. Newville, Esq., and Samuel Kramer, Esq., Madia Law LLC, counsel for
Plaintiffs.

Jason M. Hiveley, Esq., Andrew A. Wolf, Esq., and Julia Kelly, Esq., Iverson Reuvers
Condon, counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court on Defendant Samuel Higgins' ("Defendant")

Motion for Summary Judgment (Doc. No. 47) and Plaintiffs Michael Vernio's ("Vernio")

and Kelli Gendron's ("Gendron") (together, "Plaintiffs") Motion for Partial Summary

Judgment (Doc. No. 53). For the reasons set forth below, the Court denies both motions.

## BACKGROUND

On August 19, 2019, at 4:56 p.m., the City of Rochester dispatch sent out a call to

officers because of a complaint of barking dogs. (Doc. No. 50 ("Higgins Aff.") ¶ 2, Ex. 1

(Incident Report #2019-00040973 ("IR")).) Dispatch indicated that the caller had

complained earlier that morning about a barking dog.  (*See* IR.)  The caller also claimed

that the dog had been barking since 4 p.m. and that this was an ongoing issue.  (*See id*.)

Defendant answered the call.  (Doc. No. 51 ("Kelly Decl.") ¶ 2, Ex. 3 ("Higgins Dep.")

at 21.)  Upon arrival, Defendant parked in front of Plaintiffs' neighbor's house.  (*Id*.

at 50.)

Defendant first walked up the driveway of Plaintiffs' neighbor.  While standing in

the neighbor's driveway, Defendant testified that the barking appeared to be coming from

an adjacent yard.  (*Id*.)  Defendant then walked along the sidewalk in front of Plaintiffs'

house toward Plaintiffs' driveway, passing the front walkway leading to Plaintiffs' front

door.[1]  (*Id*.; Body Camera at 00:01-00:17.)  Defendant proceeded to Plaintiffs' property,

where he could hear dogs barking, and walked up the driveway toward the side door.

(Body Camera at 00:10-00:24; Higgins Dep. at 50-51.)[2]  Defendant asserts that he was

trying to find someone to speak to about the barking dogs.  (Higgins Dep. at 52.)

Plaintiffs, however, dispute this assertion and claim that Defendant was searching the

---

[1]     Defendant wore a body camera.  (Compl. ¶ 11.)  The content of the body camera
was included as an exhibit to Defendant's motion.  (*See* Doc. No. 50-2 ("Body
Camera").)  When the body camera was activated, it preserved the prior 30 seconds of
video footage and recorded all video and audio going forward.  (Higgins Dep. at 56-57.)

[2]     When facing Plaintiffs' property, their house is situated on the left side with a
driveway on the right side that extends from the street to the garage.  (Body Camera at
00:18-19.)  Partially down the driveway is Plaintiffs' side door, which is covered by an
awning and has a light, doorbell, doormat and a decorative potted plant.  (Kelly Decl. ¶ 4,
Ex. 5 ("Gendron Dep.") at 37, 84.)  In addition, package deliveries are dropped at the side
door.  (*Id*. at 39-40.)  Plaintiffs normally enter and exit their house through the side door
but claim that guests typically do not.  (*Id*. at 39.)

property for the barking dogs. (*See*, *e.g.*, Body Camera at 04:17-4:24 (suggesting that knocking on the door would not have been helpful because the dogs might have been in another yard); 10:08-10:09 (indicating that he had to investigate barking dogs and explaining that he would not have come into the area if he had not heard a dog).)

As Defendant walked up the driveway, an above-ground pool was visible behind Plaintiffs' house. (Body Camera at 00:31.) As he approached the side door, Defendant said he could see a person through the back window of the truck that was parked in the driveway. (Higgins Dep. at 52, 72-73.) That person turned out to be Gendron, who was sitting in a chair in front of the truck. Defendant could still hear the dogs barking. (Body Camera at 00:30-00:34.) In his deposition, Defendant stated:

> As I approached the door, I looked at the garage doors, I looked across, and I looked through the back window of the Ford truck that was sitting in the driveway, at which point in time I could see somebody just sitting down or somebody's head in front of the truck. I then said "hello" as I activated my body camera and walked around the front of the truck and started talking to [Gendron] in reference to the barking dogs and where they were coming from.

(Higgins Dep. at 52.) Defendant asked Gendron if the barking dogs were hers and she replied in the affirmative. (Body Camera at 00:32-00:45.) Defendant explained to Gendron that there was a complaint about the barking. (*Id*. at 00:35-00:55.)

Gendron later testified in her deposition that the barking came from a neighbor's dog and that she was startled to see Defendant. (Gendron Dep. at 48.) Gendron also asserts that Defendant looked surprised to see her. (*Id*.) Plaintiffs also claim that Defendant could not actually see Gendron until he was past the front of the truck and that

he did not pause at the side door.[3]  There is no dispute that Defendant did not knock on either the front door or the side door, despite passing both.  (Body Camera at 00:12-00:34.)

After asking for Gendron's full name and date of birth, Defendant explained that he was going to issue a warning on a city ordinance that forbids habitual barking.  (*Id.* at 1:10-1:49.)  At some point during this conversation, Gendron texted Vernio, who then came outside and asked about the barking, and went on to state that the neighbor's dog was the source of the problems.  (*Id.* at 2:18-3:23.)  Vernio also asked whether Rochester police officers "make a habit of just walking on private property."  (*Id.* at 03:56-03:59.)  During this exchange, Defendant stated that he had a right to be on private property "when we're looking for a barking dog, which is a violation of the law."  (*Id.* at 3:59-4:03.)  The parties went back and forth about Defendant's presence on the property and after Defendant stated that he "saw [Gendron] sitting back here," Vernio responded "you can't see her sitting back here."  (*Id.* at 04:05-04:11.)  After additional discussion, Defendant left the property.

---

[3]     Plaintiffs maintain that the windows of the truck are tinted (Kelly Decl. ¶ 3, Ex. 4 ("Vernio Dep.") at 35) and that the chair Gendron was sitting in was too low to see from behind the truck (Gendron Dep. at 44).  The body camera footage shows that Defendant activated his body camera before he passed the front of the car, at the point that Defendant claims he saw Gendron.  (Body Camera at 00:24-00:34.)  The body camera footage does not show that Gendron was visible through the windows of the truck, but the Court notes that Defendant wore a camera with a fisheye lens that hung roughly 16 inches below eye level on Defendant's vest.  (Higgins Dep. at 73-74.)

Plaintiffs filed the present action, alleging a single cause of action for an unreasonable search under the Fourth Amendment. Plaintiffs claim that Defendant's actions violated the Fourth Amendment by entering the curtilage of their home without a warrant or a valid reason for being there. Specifically, Plaintiffs allege that Defendant violated the scope of an implied "knock-and-talk" license. The Court previously denied a motion to dismiss. (Doc. No. 25.) Both parties now seek summary judgment.

## DISCUSSION

### I.  Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary

judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986).

## II.     Fourth Amendment—Curtilage

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.  This protection extends to the curtilage surrounding a home, which "is the area to which extends the intimate activity associated with the sanctity of a [] home and the privacies of life, and therefore has been considered part of the home itself for Fourth Amendment purposes." *United States v. Weston*, 443 F.3d 661, 666 (8th Cir. 2006) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)).  "[C]urtilage questions should be resolved with particular reference to four factors:  [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." *U.S. v. Dunn*, 480 U.S. 294, 301 (1987); *accord United States v. Wells*, 648 F.3d 671, 677 (8th Cir. 2011) (applying four *Dunn* factors to determine that unpaved driveway past rear of a defendant's home and into his backyard is part of the home's curtilage).

The Court first briefly discusses Plaintiffs' motion for partial summary judgment seeking a determination that Defendant entered the curtilage of their home when he passed the front perimeter of the house while walking up the driveway toward the back of

6

the property.[4]  The area that Plaintiffs claim is curtilage includes the portion of Plaintiffs'
driveway extending beyond the front perimeter of the home, the side door, and the area
where Gendron was sitting in the driveway.  In support, Plaintiffs argue that this area is
adjacent to Plaintiffs' residence and has added enclosure provided by the parked truck
and the above-ground swimming pool that sat behind Plaintiffs' house, as well as privacy
fences along the left and back sides of the back yard.[5]  Plaintiffs also claim that their
family uses this area as a natural extension of their home life—an area to relax, smoke,
watch television, play games, etc.  Plaintiffs maintain that courts have found similar areas
to be curtilage and that the *Dunn* factors support the same conclusion here.

Defendant opposes Plaintiffs' motion.  Defendant argues that the curtilage
determination is not appropriate for summary judgment, noting that the Eighth Circuit
has not articulated whether it will review curtilage determinations *de novo* or for clear
error.  *See Luer v. Clinton*, 987 F.3d 1160, 1166 n.3 (8th Cir. 2021) (citing *Wells* and
noting that whether the curtilage determination is reviewed *de novo* or for clear error is in
doubt in the Eighth Circuit).  Even so, whether the question is one of fact or law,
Defendant submits that the facts in the record do not demonstrate that the boundaries of
curtilage should be drawn at the front perimeter of Plaintiffs' home.  Instead, Defendant

---

[4]      Plaintiffs' motion is only partial because it would leave the factual determination
of whether Defendant had justification to enter the home's curtilage to the jury.

[5]      Plaintiffs' privacy fence is behind the back corner of their house that runs along
the rear-left side of the property.  (Gendron Dep. at 27-28.)  It sits opposite their
driveway.  (*Id*.)

submits that the facts reflect Plaintiffs' intent to establish a reasonable expectation of privacy beginning further back on the property. Defendant points out that proximity of the alleged curtilage area to Plaintiffs' home is not dispositive in a curtilage determination and that, instead, a fact-intensive analysis is required to determine "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S at 301. In addition, Defendant points to evidence in the record showing that Plaintiffs' side-door area is intended to be used by visitors, including, for example, that the side entrance has a doorbell and a doormat and is the door to which packages are delivered. In addition, Defendant argues that the area in question is not within an enclosure[6] and that the evidence does not suggest that Plaintiffs intended to mark the area beginning at the front corner of the house as their intimate space.

After careful review of the record, the Court concludes that fact issues remain that preclude a finding that the curtilage of Plaintiffs' home begins at the front boundary of the house. While the area in question is in close proximity to Plaintiffs' house, the significance of that proximity can be outweighed by other relevant *Dunn* considerations. *See, e.g.*, *United States v. Bausby*, 720 F.3d 652, 656 (8th Cir. 2013). This includes an analysis of the exterior configuration of Plaintiffs' property and whether the arrangement draws visitors to the side door and otherwise lacks indications of an expectation of

---

[6]     Defendant points out that the truck and swimming pool are not permanent structures.

privacy.  For example, whether Plaintiffs had an expectation of privacy at the beginning

of the front perimeter of their home will require consideration of the extent to which the

area was enclosed (here, not by a fence or permanent structure, but instead only partially

by a temporary swimming pool and a truck), whether and to what extent the area was

intended for visitors, and whether and to what extent Plaintiffs used the area of the front

perimeter for the extension of the family's home and privacies of life.  As the record

stands, Defendant has pointed to facts that could weigh against a finding that this area is

curtilage.  These facts include, but are not limited to, the open nature of the driveway, the

set-up of and use of the side door that appears to welcome visitors and deliveries, and

evidence suggesting instead that Plaintiffs only expected privacy further back in the

driveway.  Viewing the facts in the light most favorable to Defendant, a reasonable jury

could conclude that the curtilage does not begin at the front perimeter of the house.  Thus,

Plaintiffs' motion for partial summary judgment is denied.

## III.    Fourth Amendment- "Knock and Talk"

Defendant argues that he is entitled to qualified immunity on Plaintiffs' Fourth

Amendment claim based on an alleged violation of the knock-and-talk rule.  The doctrine

of qualified immunity protects state actors from civil liability when their "conduct does

not violate clearly established statutory or constitutional rights of which a reasonable

person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The

defense provides "ample room for mistaken judgments" as it protects "all but the plainly

incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335,

341, 343 (1986).  To overcome the defense of qualified immunity, a plaintiff must show

that:  (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.  *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted).  The Court has discretion to decide which qualified immunity prong to consider first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In determining whether the constitutional right was clearly established at the time of the conduct, the Court must ask whether the contours of the applicable law were "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Warrantless entry into the home or curtilage is presumptively unreasonable absent consent.  *Kentucky v. King*, 563 U.S. 452, 460 (2011).  Pursuant to the knock-and-talk rule, Courts have found implied consent to enter curtilage:  "[N]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways," for the purpose of making their presence known, making inquiries, or requesting consent to search.  *Wells*, 648 F.3d at 679 (citations omitted).  Such curtilage-entry based on an implied license is only permissible when accompanied by a "legitimate law enforcement objective," *Weston*, 443 F.3d at 667, that is "unconnected with a search directed against the accused," *United States v. Anderson*, 552 F.2d 1296, 1299-1300 (8th Cir. 1977) (citation omitted).

Plaintiffs argue that Defendant violated their Fourth Amendment rights by unlawfully conducting a knock-and-talk without first knocking on any doors and impermissibly entering the protected curtilage of their home.  (Compl. ¶¶ 36-40; Doc. No. 55 at 1; Vernio Dep. at 93-94.)  In support, Plaintiffs point to facts disputing Defendant's claim that he saw Gendron before he moved beyond the side door of the house.  Relying on the body camera video, Plaintiffs maintain that Defendant could not have seen Gendron before he passed the side door because of where Gendron was sitting and the location of the truck.  Plaintiffs have also pointed to record evidence that could show that Defendant's purpose for entering Plaintiffs' property was not merely to talk to the homeowners, but instead to search for the barking dogs.  (*See*, *e.g.*, Body Camera at 04:17-4:24 (suggesting that knocking on the door would not have been helpful because the dogs might have been in another yard); 10:08-10:09 (indicating that he had to investigate barking dogs and explaining that he would not have come into the area if he had not heard a dog).)  In addition, Plaintiffs point out that Defendant did not pause or stop to knock on either the front or the side door (even though he passed them both) and argue that his movement belies the assertion that he was merely trying to locate the homeowners, as opposed to entering the property to search for the barking dogs.  Moreover, Plaintiffs maintain that the driveway area beyond the front perimeter of the house is curtilage and that the area where Gendron was sitting is private because the view of her by anyone on the street was blocked by the truck.

The Court first considers whether the record, viewed in the light most favorable to Plaintiffs, shows a deprivation of a constitutional right.  Defendant argues that Plaintiffs

fail to allege a constitutional deprivation under the Fourth Amendment because they had no expectation of privacy where Gendron sat and therefore Defendant did not enter any constitutionally protected area. (Doc. No. 49 at 24-25.) However, for the same reasons discussed above with respect to Plaintiffs' curtilage argument, the Court concludes that fact issues remain as to exactly where Plaintiffs' curtilage began. At a minimum, a reasonable jury could easily conclude that Gendron was sitting in the curtilage of Plaintiffs' home. That determination will depend on the factual determinations discussed above.

Defendant also argues that, even assuming Gendron was sitting in a private space, Defendant's entry was permissible because he only made a limited intrusion. However, entry onto curtilage based on an implied license is only permissible when accompanied by a legitimate law enforcement objective that is unconnected with a search directed at the accused. Defendant maintains that he entered the area merely to talk to the homeowners. However, Plaintiffs have pointed to record evidence that could show that Defendant's purpose was to conduct a search for the barking dogs. This evidence raises a factual issue as to whether Defendant's entry was based on a legitimate law enforcement objective that was unconnected with a search of Plaintiffs' property. Therefore, viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Defendant deprived them of a constitutional right.

Defendant spends considerable time arguing that there is no precedent clearly establishing that an actual knock is always a prerequisite to the knock-and-talk exception. The Court need not consider this argument, however, because even if the law does not

clearly establish that an officer must always first knock under the rule, Defendant would not be entitled to qualified immunity here. As discussed above, to enter property based on an implied license under the knock-and-talk rule, Defendant was also required to have a legitimate law enforcement objective unrelated to a search of an accused's property. The fact issues surrounding Defendant's purpose for making a curtilage-based entry onto Plaintiffs' property and whether that purpose was permissible under an implied license preclude summary judgment regardless of whether Defendant was or was not clearly required to knock.[7]

## CONCLUSION

The Court concludes that fact issues remain with respect to the issue of where the curtilage of Plaintiffs' home began. In addition, fact issues preclude summary judgment in favor of Defendant on qualified immunity grounds. The Court notes that victory at this stage does not necessarily equate to victory at trial and, because it appears that it would

---

[7]   Even so, the Court notes that there is merit to Defendant's argument that it is not clearly established that the Fourth Amendment always requires an officer to knock on the front door before entering property under the knock-and-talk exception. In particular, there appears to be room for an officer to reasonably enter a home's curtilage without first knocking on the front door, so long as that area is in a place where the homeowners might logically be reached or is made generally accessible to visitors and other requirements of the rule are met. *See, e.g.*, *United States v. Wells*, 648 F.3d at 680 ("We are not prepared to extend the 'knock-and-talk' rule to situations in which the police forgo the knock at the front door and, *without any reason to believe the homeowner will be found there*, proceed directly to the backyard.") (emphasis added); *Carroll v. Carman*, 574 U.S. 13, 18 (2014) (reversing a Third Circuit decision finding that it was clearly established that a knock-and-talk must begin at the front door before officers go onto other parts of the property that are open to visitors).

be in all parties' interest to resolve this before trial, the Court urges the parties to attempt to do so.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant's Motion for Summary Judgment (Doc. No. [47]) is **DENIED**.

2.     Plaintiffs' Motion for Partial Summary Judgment (Doc. No. [53]) is **DENIED**.

Dated:  July 30, 2021                              s/Donovan W. Frank
                                                   DONOVAN W. FRANK
                                                   United States District Judge

14